**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KARL OLSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiff,<br><br>    v.<br><br>ENGILITY HOLDINGS, INC., LYNN A. DUGLE, STEVEN A. DENNING, DAVID M. KERKO, PETER A. MARINO, DARRYLL J. PINES, ANTHONY PRINCIPI, CHARLES S. REAM, DAVID A. SAVNER, WILLIAM G. TOBIN, JOHN W. BARTER, III, DAVID J. TOPPER, KATHARINA G. MCFARLAND, RAPTORS MERGER SUB, INC., and SCIENCE APPLICATIONS INTERNATIONAL CORPORATION,<br><br>         Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND BREACH OF FIDUCIARY DUTIES**<br><br>**JURY TRIAL DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff Karl Olsen ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of the public stockholders of Engility Holdings, Inc. ("Engility" or the "Company") against Engility's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and for breaches of fiduciary duty arising out of the Board's attempt to sell the Company to

Science Applications International Corporation through its wholly-owned subsidiary Raptors Merger Sub, Inc. (collectively "SAIC").

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading registration statement (the "S-4") to be filed with the Securities and Exchange Commission ("SEC") on October 18, 2018. The S-4 recommends that Engility stockholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby Engility is acquired by SAIC. The Proposed Transaction was first disclosed on September 10, 2018, when Engility and SAIC announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which SAIC will acquire all of the outstanding shares of common stock of Engility through an all-stock transaction. Engility stockholders will receive 0.450 shares of SAIC common stock for each share of Engility stock that they hold (the "Merger Consideration"). The deal is valued at approximately $2.5 billion and is expected to close by the end of the fiscal quarter ending February 1, 2019.

3.      The Proposed Transaction is unfair to Engility's minority stockholders. Approximately 48.6% of Engility's stock is held by Birch Partners, L.P. ("BP"). BP is equally owned by General Atlantic Service Company, LLC ("GA") and Kohlberg Kravis Roberts & Co. L.P. ("KKR"). Until February 2018, BP held over 51% of Engility's common stock and had the right to nominate four directors to Engility's 11 member Board. BP, KKR and GA were prohibited from selling their shares of Engility until March 2018. In May 2018, around the time KKR announced that it would be changing its corporate structure and incurring a higher tax liability, the Engility Board decided to consider a sale of the Company. The sales process was led by conflicted directors, members of a committee that lacked independence or authority. And the Merger Consideration fails to take into account the benefits to SAIC of Engility's business lines

and the synergies that would come from the Proposed Transaction. As such, the Individual Defendants breached their fiduciary duties to Company stockholders by agreeing to the Proposed Transaction which undervalues the Company and is the result of a flawed process.

4.     Furthermore, the S-4 is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the S-4 contains materially incomplete and misleading information concerning the sales process, financial projections prepared by Engility management, as well as the financial analyses conducted by Guggenheim Securities, LLC ("Guggenheim"), Engility's financial advisor.

5.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing an amendment to the S-4 with the SEC, unless and until the material information discussed below is included in an amendment. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

**PARTIES**

6.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Engility.

7.     Defendant Engility is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 4803 Stonecroft Blvd., Chantilly, Virginia 20151. Engility common stock trades on NYSE under the ticker symbol "EGL."

8.     Defendant Lynn A. Dugle has been CEO of the Company since March 2016 and a

director of the Company since February 2015.

9.      Defendant Steven A. Denning has been a director of the Company since 2015.

10.     Defendant David M. Kerko has been a director of the Company since 2015. Defendant Kerko was a member of the strategy committee formed to assist the Board in identifying, reviewing and assessing strategic alternatives (the "Strategy Committee").

11.     Defendant Peter A. Marino has been a director of the Company since 2015. Defendant Marino was a member of the Strategy Committee.

12.     Defendant Darryll J. Pines has been a director of the Company since 2012.

13.     Defendant Anthony Principi has been a director of the Company since 2012.

14.     Defendant Charles S. Ream has been a director of the Company since 2012.

15.     Defendant David A. Savner has been a director of the Company since 2012. Defendant Savner was a member of the Strategy Committee.

16.     Defendant William G. Tobin has been a director of the Company since 2012.

17.     Defendant John W. Barter, III has been a director of the Company since January 2017.

18.     Defendant David J. Topper has been a director of the Company since May 24, 2018. Defendant Topper was a member of the Strategy Committee.

19.     Defendant Katharina G. McFarland has been a director of the Company since June 2017.

20.     Defendants Dugle, Denning, Kerko, Marino, Pines, Principi, Ream, Savner, Tobin, Barter, Topper and McFarland are collectively referred to herein as the "Board."

21.     Defendant Science Applications International Corporation is a Delaware corporation based in Reston, Virginia.

22.     Defendant Raptors Merger Sub, Inc. is a Delaware corporation and is a wholly owned subsidiary of Science Applications International Corporation.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

24.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Engility maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Engility common stock and their successors in interest and/or their transferees, except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

27.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. As of September 5, 2018, Engility had approximately 36.9 million shares outstanding.

(b)     Questions of law and fact are common to the Class, including, inter alia, the following:

(i)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(ii)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

(iii)   Whether Plaintiff and other members of the Class would suffer irreparable injury were Defendants to file an amendment to the S-4 with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated;

(iv)    Whether the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(v)     Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(vi)    Whether the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

(vii)    Whether the Individual Defendants breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, honesty and fair dealing;

(viii)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

(ix)    whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

(c)    Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)    Plaintiff's claims are typical of those of the other members of the Class.

(e)    Plaintiff has no interests that are adverse to the Class.

(f)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.  Company Background of why the merger is bad

28.     Engility came to be in July 2012, after being spun-off from L-3 Communications Holdings, Inc. (now L3 Technologies). At that time, Engility provided engineering, training, program management and operational support for the U.S. government. In January 2014, Engility acquired Dynamics Research Corporation, expanding the Company's capabilities in homeland security, intelligence, healthcare, research and development, and financial regulation. Approximately one year later, Engility acquired TASC, Inc. That acquisition expanded the Company's portfolio, specifically in the fields of intelligence and aerospace. Now, Engility focuses on three business groups: intelligence; space and mission systems; and defense and security. Almost all of Engility's revenue comes from the U.S. government.

29.     At the time of its spin-off from L-3 Communications Holdings, Inc., Engility's CEO was Anthony Smeraglinolo. Mr. Smeraglinolo held that role, along with Chairman of the Board, until February 2016. His departure, which was sudden and unforeseen, was speculated to be over a decline in revenue and earnings guidance for 2016 and corresponding stock price drop. Along with the announced decline for 2016 guidance, Engility saw a number of contracts ending and a reduction of work for the U.S. military. Smeraglinolo was out, and one month later Defendant Dugle was in.

30.     With Dugle at the helm, Engility's fortunes stabilized. While there were ups and downs, the overall trend was year-over-year growth in net income and earnings per share.

| (in thousands) | Three Months Ending | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | June 29, 2018 | March 30, 2018 | December 31, 2017 | September 29, 2017 | June 30, 2017 | March 31, 2017 | December 31, 2016 | September 30, 2016 | July 1, 2016 |
| Revenue | $488,514 | $476,560 | $464,857 | $487,144 | $494,671 | $482,215 | $506,412 | $511,800 | $535,432 |
| Total costs and expenses | $452,977 | $449,097 | $442,297 | $450,889 | $460,551 | $451,466 | $482,351 | $474,931 | $500,369 |
| Net income (loss) | $13,756 | $6,588 | $(58,667) | $10,856 | $9,448 | $7,748 | $7,336 | $(15,334) | $4,054 |
| Less: Net income attributable to non-controlling interest | $1,829 | $99 | $893 | $1,051 | $1,817 | $815 | $650 | $1,423 | $1,560 |
| Net income (loss) attributable to Engility | $11,927 | $6,489 | $(59,560) | $9,805 | $7,631 | $6,933 | $6,686 | $(16,757) | $2,494 |
| | | | | | | | | | |
| Earnings (loss) per share attributable to Engility | | | | | | | | | |
| Basic | $0.32 | $0.18 | $ (1.62) | $0.27 | $0.21 | $0.19 | $0.18 | $(0.46) | $0.07 |
| Diluted | $0.32 | $0.17 | $ (1.62) | $0.26 | $0.20 | $0.18 | $0.18 | $(0.46) | $0.07 |

## B. Engility's Controlling Stockholder

31.     When Engility acquired TASC, Inc., that company was 99% owned by BP, which is majority owned by KKR and GA. GA and KKR each hold 48% of the limited partner units of BP. The transaction was structured in such a way that after the acquisition closed, BP and TASC's management stockholders held approximately 51% of the outstanding stock of Engility. As a condition to the acquisition, Engility entered into a stockholders agreement with BP, KKR and GA (the "Stockholders Agreement"). The Stockholders Agreement provides BP with the right to nominate four directors to Engility's 11 member board of directors as long as BP, KKR and GA hold at least 50% of Engility stock. BP also agreed to vote its shares in the same manner as all other Engility stockholders concerning the election of other director nominees.

32.     From February 26, 2015 until approximately February 2018, BP, KKR and GA held 51.3% of the outstanding Engility stock. Four directors nominated by BP have been on Engility's board of directors since February 26, 2015. In April 2018, BP, KKR and GA's ownership of Engility stock dropped to 48.6%. However, on February 28, 2018, BP, KKR and

GA amended the Stockholders Agreement; BP retained the right to nominate 4 directors, as long as it held at least 25% of Engility's outstanding common stock. In exchange, Engility could increase the number of directors on the board up to 14 members. After the Stockholders Agreement was amended, the Board increased its size by one.

33.     Still, despite holding slightly less than 50% of Engility's outstanding common stock, BP, KKR and GA have effectively exercised majority control. For example, Engility held its annual stockholder meeting on May 24, 2018. Of the 36,955,327 shares outstanding and entitled to vote, 36,225,191 were present or represented by proxies. BP, KKR and GA hold 17,920,892 shares, representing 49.47% of the voting shares at the annual meeting. But of the votes actually cast, BP, KKR and GA cast more than 50% of the votes for each of the director nominees for the Board.

**Proposal 1 – Election of Directors**

The following directors were elected to the Company's Board of Directors to serve as directors until the Company's 2021 Annual Meeting of Stockholders and until their respective successors are duly elected and qualified:

| | Votes For | Votes Withheld | Broker Non-Votes |
|---|---|---|---|
| Katharina G. McFarland | 34,694,521 | 202,622 | 1,328,048 |
| Lynn A. Dugle | 33,321,462 | 1,575,681 | 1,328,048 |
| Charles S. Ream | 34,590,763 | 306,380 | 1,328,048 |
| David J. Topper | 34,802,238 | 94,905 | 1,328,048 |

## C.  The Proposed Transaction is Unfair to Stockholders

34.     On September 10, 2018, the Board entered into the Merger Agreement with SAIC. The Proposed Transaction is entirely, objectively unfair to Engility's minority stockholders. As described in further detail herein, the process by which the Proposed Transaction was approved was led by BP, KKR and GA and skewed to an all-stock transaction to benefit KKR. BP, and by extension KKR and GA, did not condition a sale of the Company on approval by a special committee and a majority of the minority stockholders. The Strategy Committee was not independent; three of its five members are connected to BP, KKR or GA, and a fourth is Defendant Dugle. The Strategy Committee did not select its own advisors; instead, Engility's management suggested Guggenheim as financial advisor and the Board

approved Guggenheim's retention without conducting its own search. And the Strategy Committee did not negotiate the Merger Consideration.

35.    As important, the Merger Consideration fails to adequately compensate Engility's stockholders. The analyses performed by the financial advisors for both SAIC and Engility demonstrate that the exchange ratio is too low. Engility's management undervalued the Company for purposes of Guggenheim's analyses, as Engility's projected free cash flows as prepared by SAIC are significantly higher than those projected by Engility.

Unfair Process

36.    BP dominated the sales process to ensure an all-stock sale to SAIC. While BP is owned equally by KKR and GA, BP exercised its control over Engility to help KKR limit its tax liability and mollify an activist investor.

37.    In April 2017, ValueAct Capital Management LP ("ValueAct") acquired a 4.9% stake in KKR. ValueAct announced that it had invested in KKR because it believed KKR's stock was undervalued. That same month, news reports discussed ValueAct's interest in KKR converting from a partnership to a corporation. KKR's structure at that time minimized taxes, but kept the founders and employees in control of the company. It also reduced interest in investment. But in April 2017, chatter sprung up that a lower corporate tax rate might incentivize companies like KKR to become corporations, which would theoretically incentivize greater investment and thereby raise their valuations. An analyst for Citigroup, William Katz, estimated that KKR would see its earnings fall almost 20% if it converted to a corporation, but the stock price would be much higher. In May 2017, the head of ValueAct stated that if KKR's stock did not start trading higher, KKR's management would convert the company's structure.

38.    ValueAct is an activist investor, trying to change corporate behavior and value

through investment. The head of ValueAct has stated that he likes to invest in companies that are undervalued, help "fix" the company, and then sell when the company is appropriately valued. ValueAct's preferred method of "fixing" a company is not through coercion or force, but instead through dialogue. That is not always the successful approach. In 2013, ValueAct apparently worked with Microsoft's management to remove former CEO Steve Ballmer and place Satya Nadella as CEO. At this point, ValueAct has not made any public overtures concerning its vision for KKR. It has increased its stake in KKR to 9.9% and disclosed that it has had conversations with KKR's management concerning strategy and corporate governance. Otherwise, ValueAct's activism has been behind closed doors.

39.     That's not to say that it has not worked. After ValueAct mentioned a corporate structure change in 2017, KKR disclosed in February 2018 that it was considering becoming a corporation.  On May 3, 2018, KKR publicly announced that it would convert from a partnership to a corporation. According to the Wall Street Journal, the decision was encouraged by ValueAct. In fact, ValueAct's Chief Investment Officer stated that the announced conversion "will help to further expose a great business to a broader universe of potential investors, and increase long-term value for all shareholders."  The conversion was completed on July 1, 2018.

40.     The consensus is that KKR is set to see an influx of investors. As a corporation, KKR can be included in indexes, which can increase ownership by mutual funds. An analyst at Sandler O'Neill stated that he believed that the conversion could lead to a seven-fold increase in investors for KKR.

41.     But the most pronounced impact of KKR's conversion to a corporation was a significant increase in tax liability. While a partnership, KKR would have been required to pay corporate taxes on just management fees. As a corporation, KKR will be required to pay

corporate taxes on management fees and performance fees. With the tax reforms that took effect in 2018, the corporate tax rate dropped to 21% from 35%. Converting to a corporation increases KKR's tax rate from 7% to 22% over the course of five years.

42.     While KKR considered converting to a corporation, a prohibition on the sale of BP's Engility holdings was coming to a close. In connection with the acquisition of TASC, Inc. in 2015, BP was prohibited from selling its holdings of Engility common stock until March 2018. Days before the prohibition lifted, BP, KKR, GA and Engility amended the Stockholders Agreement to allow BP to continue to nominate four directors to the Engility Board, even if BP held less than 50% of Engility's outstanding common stock.

43.     By May 2018, when KKR decided to convert to a corporation, reports indicated that KKR, GA and BP were discussing how to liquidate their Engility stock. According to a Schedule 13D filed with the SEC on September 11, 2018, KKR had a pecuniary interest in 8,960,446 shares of Engility common stock held by BP. If the Merger Consideration were cash instead of stock, KKR would have to pay taxes on a portion of approximately $362.3 million.

44.     So it is not surprising that on May 23, 2018, the Board created the Strategy Committee to assist the Board in identifying, reviewing and assessing strategic alternatives. And it is not surprising that the Strategy Committee included Defendants Kerko, Topper and Marino. Defendant Marino serves as a Special Advisor for GA, for which Defendant Denning serves as Chairman. Marino also serves on the board of directors for QualityTech, LP, for which Defendant Barter also serves as director. Defendant Topper is an Operating Partner at GA. Defendant Kerko was at KKR from 1998 until 2015; he has been an advisor to KKR since 2015. Kerko is a director of BP and of KKR. The other members of the Strategy Committee include Defendant Dugle, the CEO, and Defendant Savner.

45.     At its meeting on June 28, 2018, the Strategy Committee reviewed other potential acquirers, besides SAIC. It does not appear that the Strategy Committee considered other kinds of transactions, just an acquisition of Engility. The Strategy Committee directed Guggenheim to contact four potential strategic partners, none of the parties were financial parties. The parties contacted included a company in construction, engineering and government services, which differs wildly from Engility's pure-play government services.

46.     A financial party did reach out to indicate interest in acquiring Engility and was included in the sales process. However, one day after requesting final bids, the Strategy Committee met with the CEO of SAIC. The Strategy Committee did not meet with the financial party.

47.     Ultimately, the Board directed the economic negotiations with SAIC. But the Board was conflicted. There were 12 directors on the Board when it approved the Proposed Transaction, and at least six of those directors were conflicted. Defendant Marino serves as a Special Advisor for GA, a controlling stockholder of Engility; Defendant Denning serves as Chairman of GA. Marino also serves on the board of directors for QualityTech, LP, for which Defendant Barter also serves as director. Defendant Barter and Defendant Denning were directors of Genpact at the same time, from 2005 to 2011. Defendant Topper is an Operating Partner at GA. Defendant Kerko was at KKR from 1998 until 2015; he has been an advisor to KKR since 2015. Kerko is a director of BP and of KKR. Defendants Ream and Tobin were directors for DynCorp International Inc. between 2006 and 2010, and both owned membership interests in an affiliate of Veritas Capital, which was the controlling stockholder of DynCorp International Inc. Finally, Defendant Dugle is the Chairman and CEO of Engility. Defendant Dugle sits on the board of directors for the Intelligence and National Security Alliance, along

with the CEO of SAIC.

48.     A conflicted Board. A controlling stockholder. A non-independent committee considering strategic alternatives. And no majority-of-the-minority vote. Altogether, these speak to a process unfair to the minority stockholders and a breach of the Individual Defendants' fiduciary duties.

Unfair price

49.     The Merger Consideration consists of 0.450 shares of SAIC common stock for each share of Engility common stock. Per the S-4, that equals $40.44 per share, a premium of approximately 11.6% from Engility's closing price of $36.24 on the trading day before the Proposed Transaction was announced. The Merger Consideration does not adequately compensate Engility stockholders for the synergies expected from the transaction or the expanded business opportunities for SAIC.

50.     SAIC CEO Tony Moraco noted how complementary Engility's businesses are to SAIC's business lines. The addition of Engility to SAIC will, according to Moraco, "accelerate SAIC's growth strategy into key markets, enhance its competitive position, and provide significant financial benefits. We will be a powerful force going forward." Moraco also noted that the Proposed Transaction would increase SAIC's ability to "win larger scale national security contracts."

51.     There also will be concrete financial benefits to SAIC from the Proposed Transaction. For example, the Proposed Transaction would increase free cash flows by 80% for SAIC. And the Proposed Transaction is expected to bring about annual net cost synergies of $75 million and annual gross savings of $150 million.



52.    Analysts have noted that the Proposed Transaction may not be in Engility's best interests. Joey Cresta, an analyst at market research firm Technology Business Research, stated that the Proposed Transaction would position SAIC to "compete more aggressively in the short term for the windfall resulting from busted federal budget caps." But "SAIC's long-term challenge will be no different than it is today: the automation of transactional tasks and the technology-driven compression of windows of competitive advantage threaten its legacy business model."

53.    The analyses of the Company's own financial advisor, and SAIC's financial advisors, illustrate that the Merger Consideration may not be high enough. For example, Guggenheim's *Selected Publicly Traded Companies Analysis* implied a per share equity value for Engility as high as $54.07. Citigroup Global Markets Inc.'s *Selected Public Companies Analysis* implied an exchange ratio as high as 0.631, while the *Illustrative Discounted Cash Flow Analysis of Engility Including Synergies* implied a per share equity value for Engility as high as

$55.90. Stone Key Partners LLC's *Discounted Cash Flow Analysis* implied an exchange ratio as high as 0.611, while the *Comparable Company Analysis* implied a per share equity value for Engility as high as $ 46.12.

**D. Engility's Officers Stand to Receive Benefits Unavailable to the Class**

54.     The S-4 acknowledges that the Company's executive officers have interests in the merger that may differ from those of the stockholders and may create conflicts of interest.

55.     Equity-based awards that have been awarded to and are held by Engility's executive officers and directors will vest and be converted into the right to receive either the Merger Consideration or another amount. The treatment of these equity awards, in addition to benefits provided to executive officers through the Amended and Restated Engility Holdings, Inc. Change In Control Severance Plan or an individual employment agreement, will create a windfall for Engility's executive officers that is unavailable to the common stockholders. As demonstrated in the following chart, the executive officers of Engility in total stand to receive up to $29.7 million, if they are let go without "cause" or voluntarily leave for "good reason" after the Proposed Transaction closes:

| Named Executive Officer | Cash | Equity | Perquisites / Benefits | Total |
|---|---|---|---|---|
| Lynn A. Dugle | $5,218,645 | $12,657,304 | $ 41,778 | $17,917,727 |
| Wayne M. Rehberger | $ 1,846,667 | $ 3,361,148 | $30,582 | $ 5,238,397 |
| Thomas O. Miiller | $ 1,452,668 | $ 2,424,152 | $ 30,582 | $ 3,907,402 |
| Susan M. Balaguer | $ 1,029,867 | $ 1,675,521 | $30,582 | $ 2,735,970 |

56.     The members of the Board and the executive officers stand to gain handsomely even if they stay on after the Proposed Transaction closes. In total, as demonstrated in the following chart, the executive officers and Board members will obtain more than $24 million:

| Name | No. of Engility RSU Awards | Value of Engility RSU Awards | No. of Engility PSU Awards | Value of Engility PSU Awards | Total Value |
|---|---|---|---|---|---|
| *Executive Officers* | | | | | |
| Lynn A. Dugle | 92,682 | $3,286,503 | 264,264 | $9,370,801 | $12,657,304 |

| | | | | |
|---|---|---|---|---|
| Wayne M. Rehberger | 23,511 | $833,701 | 71,276 | $2,527,447 | $3,361,148 |
| Thomas O. Miiller | 17,102 | $606,437 | 51,261 | $1,817,715 | $2,424,152 |
| Susan M. Balaguer | 11,851 | $420,237 | 35,400 | $1,255,284 | $1,675,521 |
| *Non-Employee Directors* | | | | |
| John W. Barter, III | 8,736 | $309,779 | — | — | $309,779 |
| Steven A. Denning | — | — | — | — | — |
| David M. Kerko | — | — | — | — | — |
| Peter A. Marino | 16,067 | $569,736 | — | — | $569,736 |
| Katharina G. McFarland | 7,199 | $255,277 | — | — | $255,277 |
| Darryll J. Pines | 17,499 | $620,515 | — | — | $620,515 |
| Anthony Principi | 17,499 | $620,515 | — | — | $620,515 |
| Charles S. Ream | 17,499 | $620,515 | — | — | $620,515 |
| David A. Savner | 17,499 | $620,515 | — | — | $620,515 |
| William G. Tobin | 17,499 | $620,515 | — | — | $620,515 |
| David J. Topper | — | — | — | — | — |

### E. The Preclusive Deal Protection Devices

57. As part of the Merger Agreement, Defendants agreed to certain preclusive deal protection devices that ensure that no competing offers for the Company will emerge.

58. By way of example, section 5.2(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting or encouraging the submission of an acquisition proposal. Section 5.2(a) further demands that the Company cease and terminate all solicitations, discussions or negotiations with any party concerning an acquisition proposal.

59. Despite already locking up the Proposed Transaction by agreeing not to solicit alternative bids, the Board consented to additional provisions in the Merger Agreement that further guarantee the Company's only suitor will be SAIC. For example, pursuant to section 5.2(c) of the Merger Agreement, the Company must notify SAIC of any offer, indication of interest, or request for information made by an unsolicited bidder. Thereafter, should the Board determine that the unsolicited offer is superior, section 5.2(f)(i) requires that the Board grant SAIC three (3) business days to negotiate the terms of the Merger Agreement to render the superior proposal no longer superior. SAIC is able to match the unsolicited offer because, pursuant to section 5.2(f)(i) of the Merger Agreement, the Company must provide SAIC with the

identity of the party making the proposal and the material terms of the superior proposal, eliminating any leverage that the Company has in receiving the unsolicited offer.

60.     In other words, the Merger Agreement gives SAIC access to any rival bidder's information and allows SAIC a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse for Engility, because the Merger Agreement unfairly assures that any "auction" will favor SAIC and allow SAIC to piggy-back upon the due diligence of the foreclosed second bidder.

61.     In addition, the Merger Agreement does not allow Engility to terminate the Merger Agreement in order to pursue a superior proposal. Even if the Board determines that another offer is superior and changes its recommendation to stockholders, the Merger Agreement will still stand and it would be possible for Engility stockholders to approve the Proposed Transaction despite the changed recommendation.

62.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of SAIC's inadequate offer price.

## F.  The Materially Incomplete and Misleading S-4

63.     The Individual Defendants owe the stockholders a duty of candor. They must disclose all material information regarding the Proposed Transaction to Engility stockholders so

that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

64.     On October 18, 2018, Defendants filed the S-4 with the SEC. The purpose of the S-4 is, inter alia, to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, Engility stockholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

***Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts***

65.     The S-4 discloses management-prepared financial projections for the Company which are materially misleading. The S-4 indicates that in connection with the rendering of Guggenheim's fairness opinion, Guggenheim reviewed "certain non-public business and financial information" that included "certain financial projections for Engility" as prepared by Engility's senior management. Accordingly, the S-4 should have, but failed to, provide certain information in the projections that Engility's management provided to the Board and Guggenheim.

66.     Notably, Defendants failed to disclose the projections for fiscal years 2018 to 2022 for: depreciation and amortization; EBIT; cash taxes; capital expenditures; changes in net working capital; stock-based compensation expense; and tax amortization/NOL utilization benefit.

67.     In addition, the S-4 indicates that in connection with the rendering of Guggenheim's fairness opinion, Guggenheim reviewed "certain non-public business and financial information" that included "certain financial projections for SAIC" as prepared by

Engility's senior management. Yet the S-4 does not disclose the "SAIC Adjusted" financial projections prepared by Engility's management for fiscal years 2019 to 2023 for: assumed re-compete and new business win rates (before and after adjustment); assumed margin profile (before and after adjustment); depreciation and amortization; EBIT; cash taxes; capital expenditures; changes in net working capital; and stock-based compensation expense.

68.     This omitted information is necessary for Engility stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

### *Materially Incomplete and Misleading Disclosures Concerning Guggenheim's Financial Analyses*

69.     With respect to the *Engility Discounted Cash Flow Analysis,* the S-4 fails to disclose the individual inputs and assumptions utilized by Guggenheim to derive the discount rate range of 9.0% to 10.25%. The S-4 also fails to disclose the range of implied terminal EBITDA multiples resulting from the analysis. Furthermore, the S-4 does not disclose how Guggenheim incorporated net tax assets in the analysis, if at all, and what specific normalization adjustments Guggenheim made to calculate Engility's terminal year cash flow, as well as the resulting terminal year cash flow metric. Finally, the S-4 does not disclose to what date Guggenheim discounted the projected cash flows for the analysis.

70.     With respect to the *Engility Selected Precedent Merger and acquisition Transaction Analysis*, the S-4 fails to disclose whether Guggenheim performed any type of benchmarking analysis for Engility in relation to the target companies. The S-4 also fails to disclose the calculated present value amount of tax benefits utilized by Guggenheim in its analysis.

71.     With respect to the *Engility Selected Publicly Companies Analysis,* the S-4 fails to disclose whether Guggenheim performed any type of benchmarking analysis for Engility in

relation to the selected public companies. The S-4 also fails to disclose the separate implied value ranges for each of the selected multiple ranges applied for EV/2018 EBITDA plus tax benefits, EV/2019 EBITDA plus tax benefits, EV/2018 EBITDA excluding tax benefits, and EV/2019 EBITDA excluding tax benefits. Finally, the S-4 fails to disclose the calculated present value amount of tax benefits utilized by Guggenheim in its analysis.

72.     With respect to the *SAIC Discounted Cash Flow Analysis,* the S-4 fails to disclose the individual inputs and assumptions utilized by Guggenheim to derive the discount rate range of 8.25% to 9.75%. The S-4 also fails to disclose the range of implied terminal EBITDA multiples resulting from the analysis. Furthermore, the S-4 does not disclose what specific normalization adjustments Guggenheim made to calculate Engility's terminal year cash flow, as well as the resulting terminal year cash flow metric. Finally, the S-4 does not disclose to what date Guggenheim discounted the projected cash flows for the analysis.

73.     With respect to the *SAIC Selected Publicly Companies Analysis,* the S-4 fails to disclose whether Guggenheim performed any type of benchmarking analysis for SAIC in relation to the selected public companies. The S-4 also fails to disclose the separate implied value ranges for each of the selected multiple ranges applied for EV/2018 EBITDA and EV/2019 EBITDA.

74.     With respect to the *Engility Illustrative Has/Gets Analysis (Based on Market Approach)*, the S-4 fails to disclose the specific amount of present value of Engility's NOLs utilized by Guggenheim in its analysis. The S-4 further fails to close the specific weighted average trading EV/CY2019E EBITDA capitalization multiple used in this analysis.

75.     Finally, with respect to the *Engility Illustrative Has/Gets Analysis (Based on DCF)*, the S-4 fails to disclose the individual inputs and assumptions utilized by Guggenheim to derive the pro forma WACC range of 8.0% to 9.25%. The S-4 further fails to disclose the range

of implied terminal EBITDA multiples resulting from the pro forma analysis.

### *Materially Incomplete and Misleading Disclosures Concerning the Flawed Process*

76.     The S-4 also fails to disclose material information concerning the sales process. For example, the S-4 fails to state whether the confidentiality agreements Engility entered into with Company A, Company B, Company C and Company D are still in effect and whether those agreements contain DADW standstill provisions that are presently precluding each and every of these parties from making a topping bid for the Company.

77.     The disclosure of the terms of any standstill provisions is crucial to Engility stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company. This information is especially important where, as here, the S-4 is silent as to whether any confidentiality agreements contained a standstill agreement, whether any standstill agreements have been waived, and whether Company A, Company B, Company C or Company D may now be foreclosed from making a superior proposal.

78.     In addition, section 5.2(a) of the Merger Agreement prohibits the Board from waiving any previously executed standstill agreement (the "Anti-Waiver Provision"). Whether the Board agreed to that provision knowing that agreements with Company A, Company B, Company C or Company D contained such a standstill agreement, must be disclosed to Engility stockholders before they decide on voting for or against the Proposed Transaction.

79.     Likewise, the S-4 notes that a number of the confidentiality agreements were later amended, but does not disclose the basis for those agreements being amended and how the agreements were amended. This applies to the confidentiality agreement with SAIC and Company A.

80.     The S-4 failed to disclose potential conflicts of interest concerning SAIC's or Engility's financial advisors. For example, the S-4 does not disclose whether Guggenheim provided services other than financial advisory, capital markets or other investment banking services to SAIC. The S-4 also does not disclose when Guggenheim will receive value-based or discretionary amounts from Engility and when it knew it would be eligible to receive such discretionary amounts. The S-4 fails to disclose whether Citigroup Global Markets Inc. had provided any services to Engility or had relationships with Engility. Finally, the S-4 fails to disclose whether any of the financial advisors had provided services to BP, GA or KKR, or had any relationships with BP, GA or KKR.

81.     The Board formed the Strategy Committee to assist the Board in considering strategic alternatives. But the S-4 does not disclose the powers and responsibilities of the Strategy Committee, including whether the Committee had the authority to negotiate on the Board's behalf or retain its own advisors. In addition, considering the conflicts facing a number of members of the Strategy Committee, the S-4  fails to disclose which members of the Board met with the Strategy Committee on June 28, 2018, July 12, 2018, July 18, 2018, and August 9, 2018.

82.     The Strategy Committee authorized Guggenheim to contact four potential acquirers after its meeting on June 28, 2018. However, the S-4 fails to disclose how many potential acquirers were considered, how many were financial parties, and whether the Strategy Committee discussed other strategic alternatives at that meeting.

83.     Guggenheim provided the Strategy Committee with a preliminary analysis of SAIC's initial proposal, as well as a sensitivity analysis at certain potential exchange ratios, during the July 18, 2018 meeting. Yet the S-4 fails to disclose those analyses. Similarly, the S-4

notes that Guggenheim provided the Board with a preliminary valuation analysis of Engility on a standalone basis and pro forma combined basis with SAIC. The S-4 fails to disclose those analyses.

84.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, Engility stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

85.     In addition, the Individual Defendants knew or recklessly disregarded that the S-4 omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

86.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the S-4 before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so. The Individual Defendants thus knew or recklessly disregarded that the S-4 omits the material information referenced above and contains the incomplete and misleading information referenced above.

87.     Further, the S-4 indicates that on September 9, 2018, Guggenheim reviewed with the Board its financial analysis of the Merger Consideration delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion of the same date, to the effect that the Merger Consideration was fair, from a financial point of view, to Engility stockholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning Guggenheim's financial analyses which has been omitted from

the S-4, and thus knew or should have known that such information has been omitted.

88.     Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

**CLAIMS FOR RELIEF**

**COUNT I**

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

89.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

90.     Defendants have filed the S-4 with the SEC with the intention of soliciting Engility stockholder support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the S-4, which fails to provide the material information referenced above.

91.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Engility, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

92.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary

26

in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

93.     Specifically, and as detailed above, the S-4 violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of Engility shares and the financial analyses performed by Guggenheim in support of its fairness opinion; and (iii) the sales process.

94.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the S-4 is materially misleading and omits material information that is necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the S-4 states that Guggenheim reviewed and discussed its financial analyses with the Board during various meetings including on September 9, 2018, and further states that the Board relied upon Guggenheim's financial analyses and fairness opinion in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

95.     The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of
Section 20(a) of the Exchange Act**

96.     Plaintiff incorporates each and every allegation set forth above as if fully set forth
herein.

97.     The Individual Defendants acted as controlling persons of Engility within the
meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as
officers and/or directors of Engility and participation in and/or awareness of the Company's
operations and/or intimate knowledge of the incomplete and misleading statements contained in
the S-4 filed with the SEC, they had the power to influence and control and did influence and
control, directly or indirectly, the decision making of the Company, including the content and
dissemination of the various statements that Plaintiff contends are materially incomplete and
misleading.

98.     Each of the Individual Defendants was provided with or had unlimited access to
copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to the time the
S-4 was filed with the SEC and had the ability to prevent the issuance of the statements or cause
the statements to be corrected.

99.     In particular, each of the Individual Defendants had direct and supervisory
involvement in the day-to-day operations of the Company, and, therefore, is presumed to have
had the power to control or influence the particular transactions giving rise to the Exchange Act
violations alleged herein, and exercised the same. The omitted information identified above was
reviewed by the Board prior to voting on the Proposed Transaction. The S-4 at issue contains the
unanimous recommendation of each of the Individual Defendants to approve the Proposed
Transaction. They were, thus, directly involved in the making of the S-4.

100.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

101.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

102.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## COUNT III

### Claim for Breach of Fiduciary Duties

103.     Plaintiff repeats all previous allegations as if set forth in full herein.

104.     The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, and independence owed to the former public stockholders of Engility and have acted to put their personal interests ahead of the interests of Engility's stockholders.

105.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have knowingly or recklessly and in bad faith unfairly deprived Plaintiff and the other members of the Class of the true value of their investment in the Company.

106.    The Individual Defendants' recommendation of the Proposed Acquisition will result in change of control of the Company, which imposes heightened fiduciary responsibilities to maximize Engility's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

107.    The Individual Defendants have breached their fiduciary duties of care, loyalty, good faith, candor and independence owed to the stockholders of Engility because, among other reasons:

108.    they pursued their self-interests at the cost of stockholder value;

109.    they failed to take steps to maximize the value of Engility to its public stockholders;

110.    they failed to properly value Engility; and

111.    they failed to disclose all material information that would permit the Company's stockholders to make a fully informed decision on the Proposed Acquisition.

112.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Calpine's assets and will be prevented from benefiting from a value-maximizing transaction.

113.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representatives and his counsel as Class Counsel;

B.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing an amendment to the S-4 with the SEC unless and until Defendants agree to include the material information identified above in any such amendment S-4;

C.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the S-4;

D.     Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Company stockholders and obtain a transaction which is the best interests of Engility and it's stockholders;

E.     In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

F.     Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

H.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 2, 2018

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (#4788)
901 N. Market St., Suite 1000
Wilmington, DE 19801
Telephone: (302) 778-4000
Direct Phone/Fax: (302) 778-4002
Email: rernst@oelegal.com

**ROWLEY LAW PLLC**
Shane T. Rowley
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514